| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE LAKE CIRCUIT COURT |
| | ) SS: | |
| COUNTY OF LAKE | ) | CAUSE NO.: 45C01-9511-CT-02095 |

PAREE LA'TIEJIRA
    Plaintiff

vs

MARK C. CARRIERE, individually, and
LEISURE TIME ENTERTAINMENT,
INC., an Indiana Corporation
    Defendants

**Filed in Open Court**

JAN 1 3 2010

*[signature]*
CLERK LAKE CIRCUIT COURT

## COURT'S FINDINGS OF FACT, CONCLUSIONS THEREON AND

## ORDER

This case is before the Court for ruling on Plaintiff's Complaint. On December 1, 2009, a bench trial was conducted in this case. Plaintiff appeared with Attorneys Nicholas Huang and Thomas Atz. All Defendants failed to appear. The Court, having heard testimony of the witnesses and having reviewed the exhibits introduced into evidence, and having considered the post-trial submissions of counsel, now makes the following Findings of Fact, Conclusions Thereon, and Order.

## FINDINGS OF FACT

1. The Defendants did not appear for trial, although the Clerk of the Court duly served Defendants with notice of said bench trial via first-class mail at Defendants' last known addresses disclosed by Defendants' former attorneys in their Motion to Withdraw.

2. Following the Court's grant of Defendants' former attorneys' Motion to Withdraw, Plaintiff's counsel filed a Request for Telephonic Status Conference and a Waiver of Jury Trial, and Request for Bench Trial, and served copies of same at the last known addresses for the Defendants.

3. Prior to the withdrawal of Defendants' former counsel on May 12, 2009, the parties had agreed that any deposition of Defendant Carriere would take place in Los Angeles; after Defendants' counsel withdrew, Plaintiff scheduled the deposition of Defendant Mark Carriere in Los Angeles, California, on June 25, 2009, serving notice of same to Defendants at the last known addresses to which former counsel for Defendants had corresponded with

Defendants prior to counsel's withdrawal. Counsel for Plaintiff traveled to and appeared in Los Angeles for the June 25, 2009, deposition, but Defendants failed to appear.

4. Defendants have failed to update this Court with their current addresses, and have failed to keep themselves abreast of the status of this case. All diligent efforts having been made by the Clerk of the Court and the Plaintiff to serve Defendants notice as to all filings and Court dates, the trial proceeded without Defendants being present.

5. Plaintiff is a single, African American female, born March 19, 1975, and at time of trial was thirty-four (34) years of age. In 1993, Plaintiff moved to Los Angeles, California, to pursue a career as an actress in pornographic movies, and thereafter continued to reside in Los Angeles. Since 1995, she has resided in Houston, Texas.

6. Plaintiff was last employed in 1993 in the adult entertainment industry and is currently unemployed.

7. Plaintiff brings this action alleging Defendants published false and defamatory statements about Plaintiff, resulting in Plaintiff being directly and proximately damaged.

8. Following publication of the false and defamatory statements by Defendants that Plaintiff "used to be a man," Plaintiff was examined by Dr. Wally Zollman, a plastic surgeon from Indianapolis, Indiana, who is experienced in transgender surgical procedures. Dr. Zollman confirmed that Plaintiff is a female with no signs of having undergone transsexual surgery.

9. Dr. Mark Cones also examined Plaintiff on a routine basis in Texas and confirmed Plaintiff is a female with normal gynecological exams, and determined that Plaintiff was once pregnant, which resulted in a miscarriage.

11. The Court hereby finds that Plaintiff is and has been a woman since birth, has never been a man, and has never had transgender surgical procedures performed upon her.

12. Before seeking a career as an adult film actress, Plaintiff worked as a dancer at various strip clubs. In January of 1993, Plaintiff was invited to attend the Consumer Electronics Show ("CES") held in Las Vegas, Nevada, which attracts millions of people each year. While there, Plaintiff met individuals in the adult film section of the CES who took an immediate interest in having Plaintiff perform pornographic scenes for filming. Plaintiff agreed to perform such scenes for filming, which took place in various hotel rooms while the convention was ongoing.

13. Plaintiff was employed to perform approximately two hundred (200) pornographic video scenes in one week while at the CES, and was compensated by various production companies in the total amount of one hundred ninety thousand dollars ($190,000.00) in cash.

14. Plaintiff was unique and highly demanded in the adult entertainment industry because she was willing and able to perform various sexual acts requested by directors, with the exception of transsexual or homosexual scenes. She was a fresh face in the industry at a time when there were few African American adult film actresses in the United States.

15. Ron Jeremy, a well-known male pornographic movie actor, befriended Plaintiff at the CES and introduced her to producers there, and later brought her to the attention of Defendant Mark Carriere.

16. Defendant Carriere owns and operates Defendant Leisure Time Entertainment, Inc., as well as production companies, and is referred to by many in the industry as the "King of Porn."

17. Defendant Leisure Time Entertainment, Inc. is in the business of producing and marketing adult entertainment products, primarily, adult videos.

18. In furtherance of her career, Plaintiff and Defendants entered into a Loan Contract in which the Defendants agreed to pay for Plaintiff's breast augmentation, and Plaintiff agreed to repay the loan by performing twelve (12) pornographic scenes for one of Defendant's production companies at a rate of $250.00 per scene.

19. Plaintiff also executed model "releases," in which she confirmed that she had attained the age eighteen (18). Four such purported "releases" were presented as evidence at trial. Plaintiff had revised one of the printed releases at the time of its execution to describe herself as an "actress," in her own handwriting, crossing out the term "actor," for clarification of her sexual identity on said "release."

20. Two of the releases were titled "Actor's Affidavit of Personal Information," the other two were titled "National Productions Employment Agreement Talent." The "Actor's Affidavit" releases included a clause which reads as follows: *"I hereby release my likeness and image in both video and photographic stills, I release all claims, and further agree that MULTI-MEDIA DIST. may release, and utilize any and all photo or video of me and/or likeness in any manner which they seem fit."*

Nothing in the "affidavits" indicated that any consideration was given in exchange for the purported release by Plaintiff. There was no requirement in the "affidavits" that Plaintiff perform any service, or that she would receive compensation in exchange for her release. Likewise, nothing contained in the "National Productions Employment Agreement Talent" documents referred to any consideration given or pledged for the purported "agreements." The only reference in the documents to any agreement or consideration was the sentence that reads, *"I have been paid $_____ for _____ scenes as payment in full."* The blank lines in the sentence were not filled-in with numbers.

21. Plaintiff met Defendant Carriere in April of 1993. While performing in a scene for one of Defendant's production companies, Plaintiff realized that her menstrual period had begun. The director of the scene observed blood from the menstruation and told Plaintiff he would have to "bring in the big guy," who would decide whether to discard the film from the scene. The "big guy" who was called in by the director to make a decision about the scene was Defendant Carriere. After this first meeting between Plaintiff and Defendant Carriere, they never met or had a conversation thereafter. When Defendant Carriere was called in to make a decision about the film, he was made aware of Plaintiff's menstrual period having begun.

The Court finds that Defendant Carriere therefore had actual knowledge that Plaintiff was and is a biological female.

22. Plaintiff received different pay for different types of scenes while working for Defendants, which was itemized on receipts admitted into evidence.

23. During 1993, Plaintiff was a well-publicized and well-known pornographic video actress, and received compensation outside of her work in videos, such as payment for signings, photos, club appearances, bookstore appearances, dancing, adult video store appearances and conventions.

24. Over a period of just over ten months in 1993, Plaintiff earned approximately five hundred thousand dollars ($500,000.00), in addition to the one hundred ninety thousand dollars ($190,000.00) she earned during the week at the CES convention.

25. Plaintiff's scenes were featured in approximately two hundred seventeen (217) of Defendants' adult movies, wherein she was portrayed as a female actress in all such movies except one, which was entitled *"Amazing Black Sex Changes,"* tape number NR32; tape number

NR32 consisted of a compilation of scenes from other movies in which Defendants had portrayed Plaintiff as a female.

26. On a regular basis, Defendants caused to be printed, mailed or otherwise distributed to the general public, a catalog of videotapes and paraphernalia called "Leisure Time Products Catalogue." In late 1993, a catalog created and distributed by Defendants depicted Plaintiff's image in association with language advertising a film for sale and produced by Defendants. The language used in association with Plaintiff's image read, *"Amazing Black Sex Changes...Unreal! This black beauty used to be a man! Unbelievably explicit action! #NR32..."*

27. Those statements published by Defendants were done so knowingly and intentionally, and were false.

28. Plaintiff became aware of the false publications of the Defendants in January of 1994, after she began experiencing rejections for new work; several prospective employers who rejected her for new work explained that the rejections were the result of the false publications by Defendants. During that time, a fan advised Plaintiff he had seen the ad for the film "Amazing Black Sex Changes" in Defendants' catalog. Around this same time, jobs Plaintiff had previously scheduled, including a one-month tour in Japan for which she was to be paid thirty thousand dollars ($30,000.00), all were cancelled.

29. Defendants' false publications effectively ended Plaintiff's career; no promoters, filmmakers or other actors in the industry would work with her, and Plaintiff has not been able to secure new employment in the porn industry since the time of Defendants' false publications.

30. While Defendants' false publication was without any basis in fact, certain members of the general public believed them to be true. Plaintiff has been battered and assaulted by fans as a result of Defendant's false allegations. Defendants' defamatory statements put Plaintiff at risk for violent reactions; in one such incident, a former fan slashed Plaintiff's face with a knife from her left temple to her lower left chin while declaring he believed Plaintiff used to be a man. In that attack Plaintiff suffered a cut requiring one hundred fifty (150) stitches and three cosmetic surgeries; her medical bills totaled more that one hundred forty thousand dollars ($140,000.00). Despite the surgeries, the scar is still visible today. Plaintiff has been further harassed and has received hate mail from former fans, including death threats, as a direct and proximate result of the Defendants' false publications.

31. Plaintiff has suffered emotional distress and severe depression, including thoughts of suicide, as a result of Defendants' defamatory remarks. She has sought professional psychological treatment in an effort to cope with her mental condition.

32. Three years after Defendant's defamatory remarks were initially published, porn industry publications continued to run stories about the controversy surrounding Plaintiff's true gender; presently, controversy continues to surround Plaintiff's true gender on various internet websites devoted to the adult entertainment industry.

33. Plaintiff's expert witness, Professor Martin S. Weinberg, has been a Sociology professor at Indiana University in Bloomington, Indiana, for forty-one years, and has been a sex researcher focusing on the "sexual underground" and sexual deviances for forty-five years, studying the behaviors of people who have unconventional sexualities and gender adaptations. He has been engaged in numerous studies of sex workers, and has published numerous scholarly articles regarding sexuality and sexual deviance, including a study of reactions of men and women to particular pornographic movie depictions. Professor Weinberg is certain that a rumor such as the one spread by the Defendants—that Plaintiff was really a man—would have destroyed her career.

34. Prof. Weinberg estimates Plaintiff would have been active in the porn filming industry for approximately six (6) years following the time of Defendants' publication, and perhaps would have earned additional income after the six-year period through personal appearances, selling pictures, signing autographs and the like, but that is speculative. Earnings of two hundred thousand dollars ($200,000.00) per year for the Plaintiff would not be inconsistent with what other porn actresses were making since the time of Defendants' false publications. The Court finds that Plaintiff could reasonably have earned a gross amount of three hundred thousand dollars ($300,000.00) per year for work as a porn actress over a six-year period. No evidence was presented as to the approximate amount of expenses Plaintiff would have incurred during said six-year period, but the Court finds it reasonable to assume Plaintiff would have spent money on airline and other travel expenses, hotel bills, dining expenses, wardrobe costs, publicity photographs and other related expenses; the Court assesses said expenses against gross earnings at one-third (1/3) gross income, leaving net income lost by the Plaintiff to have been approximately two hundred thousand dollars ($200,000.00) per year during the six-year period after Defendants' publication.

35. Plaintiff also experienced physical and mental pain and suffering as a result of the intentionally false publication of Defendants, and is seeking punitive damages to punish Defendants for their actions, and that Defendants be permanently enjoined from using Plaintiff's name and image as a transsexual.

36. Any proposed findings of fact that should have been deemed a conclusion thereon is hereby deemed a conclusion thereon.

## CONCLUSIONS THEREON

1. Defamation is defined as "[T]hat which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." Poyser v. Peerless, 775 N.E.2d 1101, 1106 (Ind. Ct. App. 2002); Davidson v. Perron, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999), trans. denied, 735 N.E.2d 224 (Ind. 2000).

2. Generally, in a defamation action a plaintiff must prove four elements:
A communication with defamatory imputation, malice, publication and damages.
Poyser, 775 N.E.2d at 1106; Ratcliff v. Barnes, 750 N.E.2d 433, 436 (Ind. Ct. App. 2001) trans. denied, 774 N.E.2d 513 (2002). In Poyser, 775 N.E.2d at 1106, citing with approval the case of Levee v. Beeching, 729 N.E.2d 215, 220 (Ind. Ct. App. 2000), the Court found that a communication is defamatory per se if it imputes any one of the following: criminal conduct, a loathsome disease, misconduct in a person's trade, profession, office or occupation, or sexual misconduct.

3. In this case, the Defendants' false publication imputed misconduct in the form of deception by Plaintiff in her profession by asserting untrue facts that caused others in the field to doubt Plaintiff's ability to function in her chosen industry. The Court concludes that Defendants' false publication was defamatory and obviously impugned the Plaintiff in her chosen trade or business. Weenig v. Wood, 349 N.E.2d 235, 246 (Ind. Ct. App. 1976), reh. denied (1976).

4. The Court concludes Defendants have defamed Plaintiff by their false publication because the publication consisted of words falsely written which tended to injure or prejudice Plaintiff in her trade, profession or business. Olsson v. Indiana University Board of Trustees, 571 N.E.2d 585, 587 (Ind. Ct. App. 1991), trans. denied (1991).

5. "If words falsely written or uttered tend to prejudice or injure any person in his profession, trade or business, they are actionable per se . . . The term 'defamatory per se' shall be taken to designate words whose defamatory imputation is apparent on their face; that is, words which are defamatory in and of themselves. . . "(emphasis by the Court). Big Wheel Restaurants, Inc. v. Bronstein, 302 N.E.2d 876 (Ind. Ct. App. 1973), reh. den. (1973). The Court concludes that the false publication of Defendants was defamatory *per se*.

6. In the case of Guccione v. Hustler Magazine, Inc., 632 F. Supp. 313 (S.D.N.Y. 1986) rev'd on other grounds, 800 F.2d 298 (2nd Cir. 1986), cert. denied, 479 U.S. 1091 (1987), the Court said, "Libel per se provides a unique right of action for those statements that tend to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or include an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." Id. at 316. The Court concludes that the Defendant's statement, "Amazing Black Sex Changes . . . this Black Beauty Used to be a Man!" has exposed Plaintiff to the contempt of her former fans, created an evil opinion of Plaintiff in her industry, and deprived her of any friendly intercourse in society.

7. The false statement at issue, "Amazing Black Sex Changes . . . this Black Beauty Used to be a Man!" has no reasonable interpretation other than a defamatory one.

8. Plaintiff need not prove malice unless a qualified privilege exists. Weenig, 349 N.E.2d at 247. For a qualified privilege to exist, the Plaintiff and Defendants must have a mutuality of interests. In other words, "under the qualified privilege rule [or common interest rule], a communication is privileged if made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty either public or private, whether legal, moral, or social, if made to a person having a corresponding interest or duty." Olsson, 571 N.E.2d at 587. The qualified privilege is lost if the defamation goes beyond the group interest. Weenig, 349 N.E.2d at 247-48. A qualified privilege can be lost if the Plaintiff can demonstrate facts that show the Defendants did not believe or lacked grounds to believe the truth of the allegedly defamatory statement. Ernest v. Indiana Bell Telephone Co., 475 N.E. 351, 355-56 (Ind. Ct. App. 1985).

The Court concludes that Defendants lacked a qualified privilege, and Plaintiff has satisfied the second element as to malice.

9. Defendants could not have believed the statements they published were true because: Plaintiff had the physical appearance of a female; she performed in her occupation as a female; she had previously been held out and promoted by these Defendants to be a female; she had informed defendants that she was a female; and Defendant Carriere observed, first-hand, Plaintiff menstruating during a filming of scenes for Defendants' production company.

The Court concludes that there are no facts to support any belief by the Defendants that their statement claiming Plaintiff "used to be a man" was true.

10. Actual malice occurs when "the defendant publishes a defamatory statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" Ratcliff, 750 N.E.2d at 437 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). To establish reckless disregard of falsity, Plaintiff must designate enough evidence to demonstrate that Defendants entertained serious doubts as to the truth of the published statements. The standard for reckless disregard is not a reasonably prudent person test, but rather, the defendants' subjective state of mind at the time of publication is the critical factor. Poyser, 775 N.E.2d at 1107. Indirect or circumstantial evidence is sufficient to demonstrate the Defendants' state of mind. Id.

11. At all times Plaintiff held herself out as a woman, performed her employment as a woman, Defendants requested that Plaintiff perform as a woman and never asked her to perform as a transgendered actress, Defendants represented to the public that Plaintiff was a woman, hired Plaintiff to perform as a woman and marketed her in other video releases as a woman, and referred to Plaintiff as "Lady Paree." Defendants never questioned Plaintiff's gender or if she had undergone a gender alteration. Defendants even aided Plaintiff in her desire to undergo a painful cosmetic surgery to further enhance her marketability. The Court concludes that Defendants had a subjective belief prior to publishing "Amazing Black Sex Changes . . . this Black Beauty Used to be a Man!" that Plaintiff was a woman, and that based on the subjective belief that Plaintiff was a woman, publishing the above statement must have created a serious and legitimate doubt in the Defendants' minds regarding the truth of this statement.

12. Notwithstanding this Court's previous conclusion that Plaintiff shall have presumptions under the law regarding proof of malice, the Court further concludes that Defendants exhibited actual malice, and the same has been shown by clear and convincing evidence as required by law. Poyser, 775 N.E.2d at 1107.

13. As to the third element of the claim of defamation, publication, the Defendants by their Amended Answer to Plaintiff's Amended Complaint have established that they published the statement at issue in "Leisure Time Products Catalogue."

14. The Court concludes that element four of a claim for defamation, damages, has been satisfied. Where a communication is defamatory per se, damages are presumed even without proof of actual harm to the plaintiff's reputation. Rambo v. Cohen, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992) trans. denied (1992). Even without the benefit of a presumption of damages, at a minimum, Plaintiff's reputation was damaged because of the nature of the communication. "If a communication is defamatory per se, the plaintiff is entitled to presumed damages 'as the natural and probable consequence of the per se defamation," and the law presumes the Plaintiff's reputation has been damaged, and may reward a substantial sum for this presumed harm, even without proof of actual harm." Id. Plaintiff has demonstrated that her reputation was damaged, as she became the subject of much speculation in the trade or business, she was unable to find work, her career was effectively ended, and she suffered personal injury as a proximate result of Defendants' false publication when certain fans reacted from their apparent belief that the representations of the Defendants were true.

15. The Court, having found that neither of the "affidavits" or "employment agreements" were enforceable contracts, hereby concludes that the purported release clauses in the affidavits were not binding on Plaintiff. Even if the Court assumes the affidavits and agreements were enforceable contracts, the Plaintiff authorized Defendants to use image as a female actress and model; Plaintiff never authorized Defendants to characterize her image as a transsexual.

16. Plaintiff was humiliated, depressed and became suicidal as a proximate result of the untrue publication by the Defendants.

17. In 1998, Indiana adopted a limitation on punitive damages, which were limited to the greater of three times actual damages or fifty thousand dollars ($50,000.00). IC 34-51-3-4. However, in cases which arose prior to enactment of the limitation on damages, Courts were not so limited. See, e.g. Ford Motor Company v. Ammerman, 705 N.E.2d 539 (Ind. App. 1999).

## ORDER

IT IS NOW THEREFORE ORDERED BY THE COURT AS FOLLOWS:

1. Judgment is hereby entered in favor of the Plaintiff and against the Defendants, jointly and severally, for lost income, intentional infliction of emotional distress and personal injury in the sum of TWO MILLION FIVE HUNDRED THOUSAND DOLLARS ($2,500,000.00) ; and

2. Judgment is hereby further entered in favor of the Plaintiff and against the Defendants, jointly and severally, for punitive damages in the amount of FIFTY THOUSAND DOLLARS ($50,000.00); and

3. Therefore, total judgment is hereby entered in favor of the Plaintiff and against the Defendants, jointly and severally, to bear interest at the statutory rate from date of judgment, in the total sum of TWO MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS ($2,550,000.00); and

4. Plaintiff's request for permanent injunction against the Defendants is GRANTED. The Court hereby Orders that Defendants are permanently restrained and enjoined from promoting or selling the video "Amazing Black Sex Changes," or depicting Plaintiff in any way other than as a female.

FOUND AND RECOMMENDED THIS 11TH day of JANUARY, 2010.

_____
RICHARD F. McDEVITT, MAGISTRATE
LAKE CIRCUIT COURT                /g

SO ORDERED THIS 13 day of JANUARY, 2010.

_____
LORENZO ARREDONDO, JUDGE
LAKE CIRCUIT COURT

**Distribution:**
N. Huang/ T. Atz
M. Carriere, Leisure Time Entertainment, Inc., Self Represented

RECEIVED
JAN 14 2010
CLERK LAKE CIRCUIT COURT